IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:24-cv-00419-CNS

VICKY RODRIGUEZ JUAREZ,

 Petitioner,

v.

JOHNNY CHOATE, Warden of Aurora Contract Detention Facility owned and operated by GEO Group, Inc.,
JAMISON MATUSZEWSKI, Interim Field Office Director, Denver Field Office, US Immigration and Customs Enforcement,
ALEJANDRO MAYORKAS, Secretary, US Department of Homeland Security,
PATRICK LECHLEITNER, Acting Director of Immigration and Customs Enforcement, and
MERRICK GARLAND, Attorney General, US Department of Justice,

 Respondents.

## ORDER

 This matter comes before the Court on Petitioner Vicky Rodriguez Juarez's Petition for Writ of Habeas Corpus (the Petition), as well as her Motion for Temporary Restraining Order (the Motion). ECF Nos. 1, 3. In her Petition, Ms. Rodriguez Juarez seeks a writ of habeas corpus under 28 U.S.C. § 2241, challenging her prolonged detention in Immigrations and Customs Enforcement (ICE) custody without a bond hearing. Ms. Rodriguez Juarez seeks a writ ordering Respondents to release her or, in the alternative, to provide her with a bond hearing at which Respondents bear the burden of showing by clear and convincing evidence that her continued detention is justified. For the following

1

reasons, Ms. Rodriguez Juarez's Petition is DENIED IN PART and GRANTED IN PART, and the Motion is DENIED AS MOOT.

## I.  BACKGROUND

### A.  Prior removal proceedings

Vicky Rodriguez Juarez[1] is a 47-year-old transgender woman and citizen of Honduras. ECF No. 1, ¶¶ 4, 21. Growing up in Honduras, Ms. Rogriguez Juarez was subject to physical violence, threats, and harassment, both from family members and members of the public, due to her gender identity. *See id.*, ¶¶ 22–23.

In 1994, Ms. Rodriguez Juarez entered the United States for the first time as an unaccompanied minor. ECF No. 1, ¶ 24. Immigration officials immediately detained her and placed her in removal proceedings. *Id.* Ms. Rodriguez Juarez appeared *pro se* before the Immigration Judge (IJ) and did not pursue an application for relief or protection. *See id.* The IJ issued a removal order against her accordingly. *Id.*; *see* ECF No. 11-1, ¶ 4. Before the removal order could be executed, however, Ms. Rodriguez Juarez absconded from custody, apparently in fear that she would be killed if she returned to Honduras. ECF No. 1, ¶ 24; *see* ECF No. 11-1, ¶ 5. She then remained in the United States for over 20 years. ECF No. 1, ¶ 24.

After fleeing the detention facility, Ms. Rodriguez Juarez fell victim to human trafficking, performing forced labor first as a farm worker and later as a drug seller. ECF No. 1, ¶ 25. In the ensuing years, Ms. Rogriguez was also convicted of various state-law

---

[1] Ms. Rodriguez Juarez's sex assigned at birth was male. Although she has not had the opportunity to legally change her name, Ms. Rodriguez Juarez is a transgender woman and uses the name "Vicky" and "she/her" pronouns. *See* ECF No. 1, ¶ 1 & n.1; ECF No. 11 at 3 & n.1. The Court refers to her accordingly, both in the caption and throughout this Order.

2

criminal offenses which she contends were related to her trafficking situation. *See id.*; *see also* ECF No. 11-1, ¶¶ 6–7.

In 2016, Ms. Rodriguez Juarez was convicted in the U.S. District Court for the District of Columbia of cocaine distribution and was sentenced to 60 months' imprisonment. ECF No. 1, ¶ 25; *see* ECF No. 11-1, ¶ 8. In March 2019, after serving her sentence, Ms. Rodriguez Juarez was transferred to ICE custody and deported to Honduras pursuant to the 1994 removal order. ECF No. 1, ¶ 25; *see* ECF No. 11-1, ¶ 9.

In August 2019, Ms. Rodriguez Juarez reentered the United States, again out of apparent fear for her safety. ECF No. 1, ¶ 26; *see* ECF No. 11-1, ¶ 10. ICE detained Ms. Rodriguez Juarez and reinstated the 1994 removal order. ECF No. 1, ¶ 26; *see* ECF No. 11-1, ¶ 11. In February 2020, Ms. Rodriguez Juarez was convicted in the U.S. District Court for the Western District of Texas of illegal reentry and sentenced to 24 months' imprisonment. ECF No. 1, ¶ 26; *see* ECF No. 11-1, ¶ 12. In March 2022, after serving her sentence, Ms. Rodriguez Juarez was again transferred to ICE custody, but this time placed in withholding-only proceedings. ECF No. 1, ¶ 26; *see* ECF No. 11-1, ¶ 16. That same month, an asylum officer conducted a reasonable fear interview with Ms. Rodriguez Juarez, ultimately determining that she had established a well-founded fear of persecution or torture if she returned to Honduras. ECF No. 1, ¶ 26; *see* ECF No. 11-1, ¶ 14.

### B. Current withholding-only proceedings

On March 25, 2022, Ms. Rodriguez Juarez made an initial appearance before the IJ and requested a continuance to hire an attorney, which was granted. ECF No. 1, ¶ 27; *see* ECF No. 11-1, ¶ 17. After Ms. Rodriguez Juarez was unable to secure counsel, she

appeared again before the IJ on May 3, 2022, and filed a *pro se* application for withholding of removal and deferral of removal under the UN Convention Against Torture (CAT), 8 C.F.R. § 1208.16, based on the likelihood that she would be tortured due to her gender identity if she returned to Honduras. ECF No. 1, ¶ 27; *see* ECF No. 11-1, ¶¶ 19–20. Staff at the detention facility where she was being held, however, would not accept or help her file supporting documentation for her protection claims despite an impending filing deadline for her merits hearing. ECF No. 1, ¶ 28.

Ms. Rodriguez Juarez's merits hearing first took place on June 8, 2022; during that hearing, the IJ refused to accept Ms. Rodriguez's supporting documentation because the filing deadline had passed. ECF No. 1, ¶ 29; *see* ECF No. 11-1, ¶ 22. On June 27, 2022, the merits hearing was held a second time after the IJ discovered that the court's recording device malfunctioned and had failed to record the original proceedings three weeks earlier. ECF No. 1, ¶ 29; *see* ECF No. 11-1, ¶ 23. On July 8, 2022, the IJ issued a written decision denying Ms. Rodriguez Juarez's application for withholding of removal and deferral of removal under CAT. ECF No. 1, ¶ 30; *see* ECF No. 11-1, ¶ 24.

After her protection claims were denied, Ms. Rodriguez Juarez obtained *pro bono* counsel, who helped her file a notice of appeal of the IJ's decision, followed by a motion to remand explaining what happened with the supporting documentation Ms. Rodriguez Juarez had tried to submit. ECF No. 1, ¶ 31; *see* ECF No. 11-1, ¶ 25. On April 3, 2023, the Board of Immigration Appeals (BIA) issued a decision remanding the matter with instructions to determine whether deferral of removal under CAT was warranted, holding

4

that the IJ had erred in failing to consider Ms. Rodriguez's supporting documentation. ECF No. 1, ¶ 31; *see* ECF No. 11-1, ¶ 34.

On August 2, 2023, the same IJ issued a new decision denying Ms. Rodriguez Juarez deferral of removal under CAT. ECF No. 1, ¶ 32; *see* ECF No. 11-1, ¶ 40. Ms. Rodriguez Juarez filed a notice of appeal of the IJ's most recent decision. ECF No. 1, ¶ 32; *see* ECF No. 11-1, ¶ 41. On March 7, 2024, counsel for Ms. Rodriguez Juarez filed a notice informing this Court that the BIA issued an order remanding the case to the IJ for further proceedings, finding this time that the IJ had erred in (1) denying Ms. Rodriguez Juarez the opportunity to respond to the IJ's alleged credibility and corroboration concerns, and (2) mischaracterizing Ms. Rodriguez Juarez's CAT claim by ignoring record evidence. *See* ECF No. 13 at 1. Meanwhile, as of the filing of counsel's notice, Ms. Rodriguez Juarez has been held in ICE custody for the entirety of her withholding-only proceedings—more than 736 days. ECF No. 1, ¶ 34; *see* ECF No. 13 at 2.

### C. Conditions of ICE custody

When Ms. Rodriguez-Juarez was first transferred to ICE custody in March 2022, she was held in Pine Prairie, Louisiana. ECF No. 1, ¶ 34. For the 17 months that Ms. Rodriguez Juarez was detained at the Pine Prairie facility, she was housed with the general male population, where she was subject to regular harassment and "horrible, hate-filled comments about LGBTQIA+ people" like herself. *Id.*, ¶¶ 35–36. She remained there from March 2022 until August 2023, when she filed a complaint with the Department of Homeland Security's (DHS) Office for Civil Rights and Civil Liberties about her treatment at the Pine Prairie facility. *Id.*, ¶ 37. Thereafter, Ms. Rodriguez Juarez was

transferred to an ICE facility in Aurora, Colorado, where she is now housed in the facility's "trans pod." *Id.* As of this Order, Ms. Rodriguez Juarez remains in custody at the Aurora facility. *Id.*, ¶ 34.

Following her transfer and continued detention at the Aurora facility, Ms. Rodriguez Juarez has reported deteriorating mental and physical health due to the facility's hostile, prison-like environment. ECF No. 1, ¶ 37. In particular, she reports that she has not received necessary medical care for her poor vision and painful oral health condition, nor has she received mental health counseling for her past trauma and present gender transition. *Id.*, ¶ 38. Moreover, Ms. Rodriguez Juarez reports that she has been subject to long stretches of time spent in solitary confinement, which have exacerbated her feelings of depression. *Id.*, ¶ 39. And given the pendency of her withholding-only proceedings before the IJ—during which she may not be removed to Honduras—Ms. Rodriguez Juarez may be subject to ICE detention under these conditions for many more months, or even years. *Id.*, ¶ 40.

## II. LEGAL STANDARD

### A. Habeas corpus under § 2241

Section 2241 authorizes courts to adjudicate a writ of habeas corpus when a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Habeas corpus proceedings under § 2241 "remain available as a forum for statutory and constitutional challenges to post-removal-period detention" effectuated under § 1231(a)(6). *Singh v. Choate*, No. 23-cv-02069-CNS, 2024 WL 309747, at *1 (D. Colo. Jan. 26, 2024) (citation omitted). More specifically, and

6

pertinent here, a noncitizen may bring a habeas petition under this section if his or her confinement violates the Fifth Amendment's guarantee of due process. *See Diaz-Ceja v. McAleenan*, No. 19-cv-00824-NYW, 2019 WL 2774211, at *3 (D. Colo. July 2, 2019) (citing *Straley v. Utah Bd. of Pardons*, 582 F.3d 1208, 1212 (10th Cir. 2009)).

### B.  Post-removal detention under § 1231

Two sections of the Immigration and Nationalization Act (INA) authorize detention—8 U.S.C. § 1226, which concerns noncitizens who are not yet subject to a removal order, and 8 U.S.C. § 1231, which operates in the post-removal context. Under § 1231, "when a [noncitizen] is ordered removed, the Attorney General shall remove the [noncitizen] from the United States within a period of 90 days." § 1231(a)(1). The noncitizen must be detained during this initial 90-day timeframe, *see* § 1231(a)(2), which is "referred to as the 'removal period,'" § 1231(a)(1)(A). If the noncitizen "does not leave or is not removed within the removal period," then he or she is normally subject to supervised release. § 1231(a)(3). However, certain categories of noncitizens who have been ordered removed—including inadmissible or criminal noncitizens, or noncitizens whom the Attorney General has determined are a risk to the community or are unlikely to comply with the removal order—"may be detained beyond the removal period." § 1231(a)(6). The text of the INA does not contain an express limit on the duration a noncitizen may be detained under its authority.

Separate but closely related, if a noncitizen is found to have reentered the United States illegally after having been removed pursuant to a removal order, the prior removal order "is reinstated from its original date and is not subject to being reopened or

7

reviewed," and the noncitizen "shall be removed under the prior order at any time." § 1231(a)(5). In such cases, while this provision "generally foreclos[es] discretionary relief from the terms of the reinstated order," *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 (2006), a noncitizen may still "pursu[e] withholding-only relief to prevent DHS from executing his removal to the particular country designated in his reinstated removal order," *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2282 (2021).

### III.  DISCUSSION

In her Petition, Ms. Rodriguez Juarez raises two arguments challenging her continued detention. First, she argues that because there is no significant likelihood of her removal from the United States in the reasonably foreseeable future, her immediate release is required under § 1231(a)(6) as that statute was interpreted in *Zadvydas v. Davis*, 533 U.S. 678 (2001). Second, Ms. Rodriguez Juarez argues that she is entitled under the Fifth Amendment Due Process Clause to an individualized bond hearing before an IJ while her withholding-only proceedings remain pending. For the reasons explained below, the Court rejects Ms. Rodriguez Juarez's *Zadvydas* claim, but agrees that a bond hearing is warranted as a matter of due process. Her Petition is therefore denied in part and granted in part.

**A.  Violation of § 1231(a)(6) under *Zadvydas***

Ms. Rodriguez Juarez first argues that her prolonged detention violates § 1231(a)(6) because her removal is not reasonably foreseeable. *See* ECF No. 1, ¶¶ 75–88. Her statutory argument rooted in *Zadvydas*, however, is unconvincing.

In *Zadvydas*, the U.S. Supreme Court held that although § 1231(a)(6) does not specify a time limit on how long DHS may detain a noncitizen in the post-removal period, that statute "does not permit indefinite detention." 533 U.S. at 689. Rather, "in light of the Constitution's demands," a noncitizen may be detained only for "a period reasonably necessary to bring about that [noncitizen's] removal from the United States." *Id.*; *accord Johnson v. Arteaga-Martinez*, 596 U.S. 573, 579 (2022). According to the *Zadvydas* Court, the period reasonably necessary to effect the noncitizen's removal is presumptively six months. *Zadvydas*, 533 U.S. at 701; *see Arteaga-Martinez*, 596 U.S. at 587 (Breyer, J., concurring). However, this presumption does not trigger a *per se* release of every noncitizen at the six-month mark—"[t]o the contrary, [a noncitizen] may be held in confinement until it has been determined that there is *no significant likelihood of removal* in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701 (emphasis added).

Here, Ms. Rodriguez Juarez has been detained for more than 736 days—over four times the presumptive limit set forth in *Zadvydas*. She thus contends that, given her ongoing withholding-only proceedings, *Zadvydas* compels her immediate release because her removal is not significantly likely in the reasonably foreseeable future. But while months, if not years, of additional detention is significant, the concern animating the Supreme Court's decision in *Zadvydas* was not just *prolonged* detention—it was *indefinite* detention of noncitizens who have no prospect of removal at any point in the future.[2] *See Zadvydas*, 533 U.S. at 695 ("Rather, the issue we address is whether

---

[2] Looking to the petitioners in *Zadvydas* would tend to bear out the notion that the Supreme Court was concerned with noncitizens whose removal from the United States is practically unattainable, thereby rendering their detention potentially permanent. In that case, one petitioner was ordered removed, but could not be, because he was not a recognized citizen of any country. *Zadvydas*, 533 U.S. at 684–85. The other

9

[noncitizens] that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.").

Put simply, Ms. Rodriguez Juarez's removal is reasonably foreseeable, as it depends solely on her pending withholding-only proceedings. Once those proceedings have concluded, she will be either removed or released. *See Soberanes v. Comfort*, 388 F.3d 1305, 1311 (10th Cir. 2004) (explaining that the detention of a noncitizen during an appeal is "associated with a judicial process that has a definite . . . termination point," and is "neither indefinite nor potentially permanent"); *M.P. v. Joyce, et al.*, No. 1:22-cv-06123, 2023 WL 5521155, at *4 (W.D. La. Aug. 10, 2023) ("[D]etention is neither indefinite nor potentially permanent where the delay in removal is directly attributable to the litigation activity of the [noncitizen]."); *Portillo v. Decker*, No. 21 Civ. 9506, 2022 WL 826941, at *5 (S.D.N.Y. Mar. 18, 2022) ("For obvious reasons, a noncitizen's use of the American judicial process, to the extent it delays removal, does not warrant release under *Zadvydas*."). Indeed, the lack of any other impediment to her removal is illustrated by her prior removal to Honduras in 2019. Accordingly, Ms. Rodriguez Juarez's *Zadvydas* claim for immediate release is denied.

### B. Violation of Fifth Amendment Due Process Clause

In addition, or in the alternative, Ms. Rodriguez Juarez argues that her prolonged detention without an individualized bond hearing violates the Fifth Amendment's procedural due process guarantee. *See* ECF No. 1, ¶¶ 45–74. Here, the Court agrees.

---

petitioner was ordered removed, but could not be, because the United States lacked a repatriation treaty with the proposed country of removal. *Id.* at 685–86.

10

It is "well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Indeed, this protection applies to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Id.* at 690. Under these due process principles, civil immigration detention is constitutional only in "certain special and narrow nonpunitive circumstances," and it must "bear a reasonable relation to the purpose" for which the noncitizen was detained. *Id.* (citations, brackets, and quotation marks omitted). The Supreme Court has identified those purposes as mitigating the risk of danger to the community and preventing flight. *Id.* at 690–91; *accord Demore*, 538 U.S. at 527–28. And when a noncitizen's detention becomes unreasonably prolonged in relation to these purposes, his or her continued detention may violate the Fifth Amendment. As such, noncitizens detained under § 1231(a)(6) past the *Zadvydas* six-month presumptively constitutional period may bring an as-applied due process challenge to his or her detention under the statute. *See Arteaga-Martinez*, 596 U.S. at 583.

As an initial matter, Respondents argue that notwithstanding the duration of Ms. Rodriguez Juarez's detention, she has been provided with adequate process in the form of ICE's own custody review procedures. *See* ECF No. 11 at 10–11. In particular, Respondents observe that, as required by § 1231(a)(6)'s implementing regulations (found

at 8 C.F.R. § 241.4), Ms. Rodriguez Juarez's detention has been reviewed by the ICE field office at the end of her removal period, by a panel at ICE headquarters after six months, and by the same panel annually thereafter—all for a total of seven custody reviews. *See* ECF No. 11-1, ¶¶ 21, 29, 32, 33, 38, 42, 47. The Court, however, agrees with Ms. Rodriguez Juarez that it is, at best, doubtful whether ICE's periodic custody reviews satisfy the Fifth Amendment's due process demands. *See* ECF No. 12 at 2–3; *see also Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 227 (3d Cir. 2018) ("The DHS regulations that implement the Government's detention authority under § 1231(a)(6) themselves 'raise serious constitutional concerns.'") (quoting *Diouf v. Napolitano*, 634 F.3d 1081, 1091 (9th Cir. 2011)); *Zadvydas*, 533 U.S. at 692 ("[T]he Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights.") (citation omitted).[3] As such, the Court's due process analysis does not end at Respondent's insistence that ICE's own internal review procedures suffice.

There remains, however, some ambiguity about the proper framework to analyze Fifth Amendment due process challenges for individuals like Ms. Rodriguez Juarez, who are being detained under § 1231(a)(6). *See, e.g.*, *Cabrera Galdamez v. Mayorkas*, No. 22 Civ. 9847 (LGS), 2023 WL 1777310, at *4–7 (S.D.N.Y. Feb. 6, 2023) (analyzing a noncitizen's due process challenge under the framework of *Mathews v. Eldridge*, 424

---

[3] As noted below, the *Arteaga-Martinez* Court abrogated *Guerrero-Sanchez*, *Diouf*, and similar cases to the extent that they held that the text of § 1231(a)(6) requires individualized bond hearings after the *Zadvydas* presumptive six-month period has elapsed. *See* 596 U.S. at 578. However, the discussions of *Guerrero-Sanchez*, *Diouf*, and their progeny remain good law to the extent that they analyze the length of a noncitizen's § 1231(a)(6) detention as a matter of due process. The Court relies on these cases for their constitutional (not statutory) analysis accordingly.

U.S. 319 (1976)); *Michelin v. Oddo*, No. 3:23-cv-22, 2023 WL 5044929, at *6–7 (W.D. Pa. Aug. 8, 2023) (employing a four-factor balancing test articulated in *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 212–13 (3d Cir. 2020)); *Zavala v. Martin*, C.A. No. 21-500 WES, 2022 WL 684147, at *6 (adopting the non-statutory due process analyses conducted in *Guerrero-Sanchez*, 905 F.3d at 225, and *Diouf*, 634 F.3d at 1091–92). Indeed, after finding as a matter of *statutory interpretation* that § 1231(a)(6) does not require bond hearings when detention has become unreasonably prolonged, the *Arteaga-Martinez* Court chose not to address *constitutional* question, choosing instead to leave the due process analysis "for the lower courts to consider in the first instance." *Arteaga-Martinez*, 596 U.S. at 583.

Here, Ms. Rodriguez Juarez proposes that this Court analyze whether her detention has become unconstitutionally prolonged under the six-factor balancing test set forth in *Singh v. Choate*, No. 19-cv-00909-KLM, 2019 WL 3943960, at *5 (D. Colo. Aug. 21, 2019). *See* ECF No. 1, ¶ 51. Respondents, however, contend that application of the *Singh* test is inappropriate in the § 1231(a)(6) *post-removal* context. More specifically, Respondents argue that the *Singh* test was developed for use in the § 1226(c) *pre-removal* context, and that noncitizens detained under § 1226(c) and § 1231(a)(6) are differently positioned in terms of due process concerns. *See* ECF No. 11 at 11–12. On this point, the Court agrees with Ms. Rodriguez Juarez—there appears to be little substantial distinction between the liberty interest of noncitizens detained pursuant to § 1226(c) and § 1231(a)(6), because "[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention." *Guerrero-*

13

*Sanchez*, 905 F.3d at 222 (quoting *Diouf*, 634 F.3d at 1087). Accordingly, the Court will proceed to examine Ms. Rodriguez Juarez's detention under the *Singh* framework for § 1226(c) detainees.

Under *Singh*, to determine whether a noncitizen's detention has become so prolonged as to violate due process, courts consider six factors:

> (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

*Singh*, 2019 WL 3943960, at *5.

First, as discussed previously, it is undisputed that Ms. Rodriguez Juarez has now been detained for more than 736 days—over four times the presumptive six-month limit set forth in *Zadvydas*. ECF No. 13 at 2. As such, the first *Singh* factor weighs in Ms. Rodriguez Juarez's favor. *See, e.g.*, *Villaescusa-Rios v. Choate*, No. 20-cv-03187-CMA, 2021 WL 269766, at *3 (D. Colo. Jan. 27, 2021) (collecting cases).

Second, the Court considers the likely duration of future detention. Given the BIA's recent order remanding Ms. Rodriguez Juarez's case, additional withholding-only proceedings before the IJ are now a certainty. ECF No. 13 at 1. While her "detention will definitely terminate at some point, [ ] that point is likely to be many months or even years from now." *Villaescusa-Rios*, 2021 WL 269766, at *3 (quoting *Singh*, 2019 WL 3943960, at *6). Therefore, this factor favors Ms. Rodriguez Juarez.

Third, the Court considers the conditions of Ms. Rodriguez Juarez's detention. As set forth above, Ms. Rodriguez Juarez has reported that the conditions of her detention

14

are poor and have exacerbated her physical and mental health complications. ECF No. 1, ¶¶ 34–40. Respondents suggest that since her transfer from the Pine Prairie facility to the Aurora facility last year, Ms. Rodriguez Juarez's circumstances have greatly improved—e.g., she has been housed with other transgender detainees and received gender affirming services while in detention. *See* ECF No. 11 at 6, 13. This is insufficient, however, to explain how the conditions of Ms. Rodriguez Juarez's civil immigration detention differ from the conditions of penal confinement. *See Singh v. Garland*, No. 21-CV-00715-CMA, 2021 WL 2290712, at *4 (D. Colo. June 4, 2021), *appeal dismissed* (Aug. 5, 2021) (concluding third *Singh* factor looks to whether conditions of immigration detention are "meaningfully different" from penal institutions and that the factor favored petitioner where respondents failed to explain how immigration detention "differ from penal confinement"). Therefore, the third *Singh* favor favors Ms. Rodriguez Juarez.

Fourth, the Court looks to any delays in removal proceedings caused by Ms. Rodriguez Juarez. She contends the factor favors her because she has not engaged in any dilatory tactics and has instead diligently pursued the adjudication of her withholding-only proceedings. ECF No. 1, ¶¶ 63–65. Respondents contend that Ms. Rodriguez Juarez caused delay by seeking a continuance and multiple briefing extensions. ECF No. 11-1, ¶¶ 27, 44. Although Ms. Rodriguez Juarez did extend the length of her removal proceedings, there is nothing to show she engaged in improper dilatory tactics—instead, she engaged in good-faith efforts to obtain counsel and to allow counsel adequate time to prepare her merits briefing before the IJ. Therefore, this factor is neutral. *See Villaescusa-Rios*, 2021 WL 269766, at *4 (citing *Singh*, 2019 WL 3943960, at *6).

15

Fifth, the Court asks whether any delays in the removal proceedings were caused by the government. Ms. Rodriguez Juarez contends that the government has significantly delayed or prolonged the adjudication of her removal proceedings—in particular, in the detention staff's refusal to accept or help file Ms. Rodriguez Juarez's supporting documentation prior to the filing deadline, the IJ's later refusal to consider this supporting evidence, the multiple merits hearings Ms. Rodriguez Juarez had to undergo because of the IJ's recording malfunction, and the BIA's two separate remands of her case due to reversible errors in the IJ's analysis of her protection claims. ECF No. 1, ¶¶ 66–70; ECF No. 13 at 1. Respondents acknowledge these various delays. *See* ECF No. 11 at 13. As such, this factor favors Ms. Rodriguez Juarez.

Sixth, the Court considers the likelihood that removal proceedings will result in Ms. Rodriguez Juarez's removal. Ms. Rodriguez Juarez argues she is likely to prevail on her claim for deferral under CAT, chiefly because of the strength of her country conditions evidence "documenting widespread, systemic, state-sponsored violence against LGBTQIA+ individuals in Honduras—particularly against transgender women," as well as the Tenth Circuit's previous acknowledgement of abuses against transgender women in Honduras, *see Aguilar v. Garland*, 29 F.4th 1208, 1210 (10th Cir. 2022). *See* ECF No. 1, ¶ 71. Similarly, Ms. Rodriguez Juarez's most recent BIA appeal concluded in her favor, with the BIA directing the IJ on remand to engage with the strong country conditions evidence noted above—i.e., "whether the applicant, as a transgender woman, is more likely than not to be tortured by anyone in Honduras given that 'members of the LGBTQI+ community are faced with significant human rights violations in Honduras . . . [including]

16

killings, violence . . . and other forms of mistreatment." ECF No. 13 at 1 (citation omitted). By contrast, Respondents maintain that Ms. Rodriguez Juarez's CAT claim is ultimately unlikely to succeed, because by the government's estimates, "only around 11% of noncitizens placed in withholding-only proceedings prevail on their applications." ECF No. 11 at 13–14. Overall, the Court finds that this factor slightly favors Ms. Rodriguez Juarez, only because she previously received a positive "well-founded fear" finding from asylum officials, which would tend to suggest that her CAT claim is colorable. *See* ECF No. 1, ¶ 26.

In sum, four *Singh* factors clearly favor Ms. Rodriguez Juarez, one is neutral, and the sixth favor slightly favors Ms. Rodriguez Juarez. On balance, the *Singh* factors weigh in Ms. Rodriguez Juarez's favor. Thus, her continued detention requires an individualized bond hearing before an IJ in order to comport with due process.

### C. Procedural requirements for Ms. Rodriguez Juarez's bond hearing

In addition, Ms. Rodriguez Juarez argues that at the bond hearing, the burden of proof should be placed on the government to show by clear and convincing evidence that her continued detention is justified. ECF No. 1, ¶¶ 91–94. Predictably, Respondents disagree, insisting that the burden of proof should remain with Ms. Rodriguez Juarez. ECF No. 11 at 14–15. On this point, the Court finds that Ms. Rodriguez Juarez has the better of this argument.

To be sure, the Supreme Court has held that, on its face, the text of § 1236(a)(6) does not require the government to provide noncitizens with a bond hearing at all, let alone one in which the burden is allocated to the government. *See Arteaga-Martinez*, 596

U.S. at 580–82. As explained above, however, Ms. Rodriguez Juarez's entitlement to a bond hearing in this case emanates from the Due Process Clause, not from the post-removal detention statute. And in that light, to the extent that the Court has already determined that a bond hearing is warranted, the Court is persuaded that placing the burden of proof on the government comports with due process requirements. *See Cabrera Galdamez*, 2023 WL 1777310, at *8–9; *Michelin*, 2023 WL 5044929, at *8; *Zavala*, 2022 WL 684147, at *6; *see also German Santos*, 965 F.3d at 213–14 (in the § 1226(c) context, explaining that the government bears the burden of proof by clear and convincing evidence because the noncitizen's "potential loss of liberty is so severe"; further observing that a noncitizen's detention "is likely to be longer under § 1231(a)(6) than under § 1226(c)," and that "detention after a removal order has no built-in end date").

Thus, at Ms. Rodriguez Juarez's bond hearing, the government will bear the burden to show by clear and convincing evidence that continued detention is justified.

### D.  Ms. Rodriguez Juarez's remaining requests for relief

In addition to her requests for the Court to order Respondents to show cause why the Petition should not be granted, as well as for an individualized bond hearing—both of which have already been granted—Ms. Rodriguez Juarez further asks the Court to grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Enjoin Respondents from transferring her outside the jurisdiction of the District of Colorado pending the resolution of this case;

(3) Issue a writ of habeas corpus directing Respondents to release Ms. Rodriguez Juarez on her own recognizance as an alternative to an individualized bond hearing;

    (4) Award her attorney's fees and costs under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

    (5) Grant any other relief the Court deems just and proper.

ECF No. 1 at 40–41. For the reasons set forth above, the Court grants Ms. Rodriguez Juarez's first request. Regarding Ms. Rodriguez Juarez's second request, the Court denies it as moot, given the entry of this Order. The Court denies Ms. Rodriguez Juarez's third request, having found instead that an individualized bond hearing is appropriate. As for Ms. Rodriguez Juarez's fourth request, she must file a separate motion, *see* D.C.COLO.LCivR 7.1(d), for attorney fees supported by affidavit, *see* D.C.COLO.LCivR 54.3(a). As such, she may file a motion for attorney's fees that complies with the Local Rules.

## IV.  CONCLUSION

Consistent with the foregoing analysis, the Court ORDERS as follows:

(1) Ms. Rodriguez Juarez's Petition for Writ of Habeas Corpus, ECF No. 1, is DENIED IN PART and GRANTED IN PART;

(2) Ms. Rodriguez Juarez's Motion for Temporary Restraining Order, ECF No. 3, is DENIED AS MOOT; and

(3) On or before April 5, 2024, Respondents shall take Ms. Rodriguez Juarez before an impartial immigration judge for a constitutionally adequate, individualized bond hearing in which the government shall bear the burden to demonstrate by clear and convincing evidence that Ms. Rodriguez Juarez is a flight risk or a danger to the community and continued detention is justified. At the bond hearing, the immigration judge is required to: meaningfully consider alternatives to imprisonment such as community-based alternatives to detention including conditional release, parole, as well as Ms. Rodriguez Juarez's ability to pay a bond; not give undue weight to allegations underlying any dismissed or pending criminal charges; not place undue weight on unauthenticated or antiquated documents

regarding alleged criminal legal contacts; and must consider Ms. Rodriguez Juarez's mental health diagnoses when considering any criminal legal contacts.

(4) The Clerk of Court is directed to close this case.

DATED this 8th day of March 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge